STATE EX INF. THE ATTORNEY GENERAL *v.* DAVID W. HILDRETH.

May Term, 1909.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed October 6, 1909.

*Interpretation of Statutes—Changing the Common Law—Contempt of Court—Power Summarily to Punish.*

The general rule is that if a statute fixing a penalty for an offence does not expressly nor by implication displace the common-law prosecution or punishment therefor, it shall be taken to intend a cumulative remedy.

The common law is not changed, but only a cumulative remedy afforded, by P. S. 5898, punishing by fine a person who defames a court of justice, or a sentence or proceeding thereof, or defames the magistrate, judge, or justice of such court, as to an act or sentence therein passed.

In construing statutes, the rules of the common law are not to be changed by doubtful implication, but only by clear and unambiguous language.

It is contempt at common law, punishable by the court on summary process, to scandalize a court of record by a newspaper publication in respect of the court's decision in a case no longer pending.

INFORMATION presented by the Attorney General to the Supreme Court for Orleans County at its May Term, 1909, asking that the respondent be cited to show cause why he should not be punished for contempt of said Court. Heard on demurrer to the information. Demurrer overruled, and the respondent adjudged guilty of contempt of court, and fined.

*John G. Sargent,* Attorney General, for the State.

The power to punish as for a criminal contempt is inherent in the Court as well after a case is finally disposed of as where it is still pending. *State* v. *Morrill,* 16 Ark. 384; *Com.* v. *Dandridge,* 2 Va. 409; *In re Chadwick,* 109 Mich. 588, 67 N. W. 1070; *In re Prior,* 18 Kan. 72; *Fishback* v. *State,* 131 Ind. Sup. 600; *People ex rel. Connor* v. *Stapleton,* 18 Col. Sup. 373, 33 Pac. 167;

*Cooper* v. *People,* 13 Col. 337; *Burke* v. *Territory of Oklahoma,* 2 Okl. 499; *Little* v. *State,* 90 Ind. 338; *State ex inf. Crow, Atty. Gen.* v. *Shepard,* 177 Mo. 205.

*Young & Young* for the respondent.

"Publication must relate to pending cause.  A slanderous and libelous publication concerning the judge, in relation to an act already done, or a decision rendered, cannot be punished by the court as contempt.  However criminal the publication may be, it lacks that necessary ingredient to constitute a contempt, of tending to prejudice the cause or to impede its progress."  7 Am. & Eng. Enc. of Law 61; *Story* v. *People,* 79 Ill. 45, 22 Am. Rep. 158; *Cheadle* v. *State,* 110 Ind. 301, 59 Am. Rep. 199; *Percival* v. *State,* 45 Neb. 741, 50 Am. St. Rep. 568; *State* v. *Circuit Court,* 97 Wis. 1, 65 Am. St. Rep. 90; *Cooper et al.* v. *People of Colorado,* 6 L. R. A. 430; *Oregon* v. *Kaiser,* 8 L. R. A. 584.

ROWELL, C. J.   This is an information presented to this Court by the Attorney General *ex mero motu,* asking that the respondent be cited to show cause why he should not be punished for contempt for defaming the Court in an article that he wrote and published in his own newspaper of and concerning a certain decision that the Court had recently announced that finally determined the case in which it was rendered.  The respondent was cited and appeared.

The article entirely misconceived and misstated the ground and reason of the decision, and the respondent did not claim that it was not defamatory, as it most clearly was, and highly so, for it impugned the motives of the Court and charged it with corruption.  But he objected by demurrer that as the case was not pending when the article was published, but had been finally determined, the Court had no jurisdiction to proceed against him for contempt, but that he could be proceeded against only by indictment or information.  This objection was not sustained, the demurrer was overruled, the respondent adjudged guilty of contempt and fined.

There are, undoubtedly, many cases in this country that support the respondent's contention.  But it will be found, we think, that though a few of them rest upon constitutional provisions, that the more part rest upon statutory provisions that

expressly or impliedly undertake to limit the jurisdiction of courts to punish for contempt, and to confine it to pending cases; and although it is very generally held that legislatures cannot thus limit and confine the power of the courts, yet many courts, it would seem, have been content to follow those provisions without questioning the power of the legislature to make them.

But whatever may be true of those cases, the common law governs here, for we have no constitutional provision on the subject, and no statutory provision save that which enacts that a person who defames a court of justice, or a sentence or proceeding thereof, or defames the magistrate, judge, or justice of such court as to an act or sentence therein passed, shall be fined not more than so much. P. S. 5898. But this statute does not change the common law of the subject, for as said in *Dewey* v. *St. Albans Trust Co.,* 57 Vt. 332, 338, speaking of the construction of statutes, ''the rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language,'' and here is no certain implication of change, nor clear and unambiguous language of overturn. And besides, it is a general rule that if a statute fixing a penalty for an offence does not expressly nor by implication cut off the common law prosecution or punishment for the same offence, it shall be taken to intend a cumulative remedy only. Black, Interp. Laws, 234; *The People* v. *The Bristol &c. Turnpike Co.,* 23 Wend. 222, 244. The precise question is, therefore, whether it is a contempt at common law to scandalize a court of record by a newpaper publication in respect of its decision in a case no longer pending.

Lord *Hardwick* says there are three different sorts of contempt. One, scandalizing the court itself; one, abusing parties who are concerned in cases in court; and one, prejudicing mankind against persons before the case is heard. 2 Atk. [471]. Blackstone says that contempts that are punishable by attachment are either direct, which openly insult or resist the powers of the court or the persons of the judges who preside there, or else are consequential, which plainly tend to create universal disregard of their authority. In giving the principal instances of each kind, he says that a contempt arises by speaking or writing contemptuously of the court or of the judges acting in their judicial capacity, and, in short, by any thing that demonstrates

a gross want of that regard and respect which, when once courts of justice are deprived of, their authority, so necessary for the good order of the kingdom, is entirely lost among the people. 4 Bl. Com. [*283] et seq.   The reason that prompted the passage of our statute for the punishment of defamation is to the same effect, as shown by the preamble of the original act, passed in 1787, which recites that "whereas defaming the civil authority of the State greatly tends to bring the same into contempt and enervate the government, for the prevention whereof" the act was passed.  Sts. 1787, p. 46.

There is a collection of cases of commitments for contempts by courts of justice in 8 St. Trials, [49 and 50], all of which are more or less in point here, but we state only two of them.  In Easter Term, 6 Geo. II, one Wilkins having confessed himself guilty of publishing a libel upon the Court of King's Bench, the court made a rule committing him to the marshal.  The next term, having made an affidavit charging another with being the author of the libel, he was sentenced to pay a fine and to give security for his good behavior for a year.  In Trinity Term, 7 Geo. II, an attachment was granted against John Barber for contemptuous words of the Court of King's Bench uttered in a speech to the Common Council of London.  This case is also to be found in 1 Strange, [444].

It has often been said by English judges that the history, purpose, and extent of this jurisdiction are competently treated by *Wilmot,* C. J., in an undelivered opinion in *The King* v. *Almon,* 8 St. Trials, [54].  The occasion of it was a motion in the King's Bench for an attachment against Almon for contempt in publishing a libel on the court and the Chief Justice.  "Indeed it is admitted," says the Chief Justice, "that attachments are very properly granted for resistance of process or a contumelious treatment of it, or for any violence or abuse of the ministers or others employed to execute it; but it is said that the courts of justice in those cases are obstructed, and that the obstruction must be instantly removed, but that there is no such necessity in the case of libels upon courts or judges, which may wait for the ordinary method of prosecution without any inconvenience whatever.  But when the nature of the offence of libeling judges for what they do in their judicial capacities, either in court or out of court, comes to be considered, it does, in my opinion,

become more proper for an attachment than any other case what-soever. * * * In the moral estimation of the offence, and in every public consequence arising from it, what an infinite dis-proportion is there between speaking contumelious words of the rules of the court, for which attachments are granted constantly, and coolly and deliberately printing the most virulent and malig-nant scandal that fancy can suggest upon the judges themselves. It seems to be material, to fix the ideas of the words *authority* and *contempt of court,* to speak with precision upon the ques-tion. The trial by jury is one part of that system, the punish-ing of contempts of court by attachment is another part. We must not confound the modes of proceeding, and try contempts by juries and murders by attachment. We must give that energy to each which the Constitution prescribes. In many cases we may not see the correspondence and dependence that one part of the system has and bears to another part, but we must pay such deference to the wisdom of many ages as to presume it. And I am sure it wants no great intuition to see that trials by jury will be buried in the same grave with the authority of courts that are to preside over them.''

In *McLeod* v. *St. Aubyn,* [1899] A. C. 549, the Privy Coun-cil held that contempts of court could be committed by publishing scandalous matter respecting the court after adjudication as well as pending a case before it; but said that in England, com-mittals for contempt for scandalizing the court itself had be-come obsolete, though in small colonies, consisting mostly of colored populations, like the island of St. Vincent whence that case came, such committals might still be necessary in proper cases. But the very next year there arose in England itself the case of *The Queen* v. *Gray,* [1900] 2 Q. B. 36, in which the Queen's Bench Division held that the publication in a newspaper of an article containing scurrilous personal abuse of a judge with reference to his conduct as a judge in a judicial proceeding that had terminated, was a contempt of court, punishable by the court on summary process. The opinion was delivered by Lord Chief Justice *Russell* of Killowen, who said that it could not be doubted, and indeed had not been argued to the contrary, that the article constituted a contempt of court; but as those applica-. tions were, happily, of an unusual character, they thought it right to explain a little more fully than perhaps was necessary,

what constitutes a contempt of court, and what means the law had put into the hands of the judiciary for checking and punishing such contempts. He then goes on to say that any act done or writing published calculated to bring the court or a judge of the court into contempt or to lower his authority, is a contempt of court; that that is one class of contempt; that any act done or writing published calculated to obstruct or to interfere with the due course of justice or the lawful process of the courts, is also a contempt of court; that the former class belongs to the category that Lord *Hardwick* characterizes as "scandalizing the court itself"; but that the description of that class of contempts is to be taken subject to an important qualification, namely, that courts and judges are alike open to criticism, and if reasonable argument or expostulation is offered against any judicial act as contrary to law or to the public good, no court could nor would treat that as contempt of court; that the law ought not to be astute in such cases to criticise adversely what is published in such circumstances and with such an object; but that it is to be remembered that in this matter the liberty of the press is no greater than the liberty of every subject of the Queen. His Lordship goes on still further to say: "Now, as I have said, no one has suggested that this is not a contempt of court, and nobody has suggested nor could suggest that it falls within the right of public criticism in the sense I have described. It is not criticism; it is personal and scurrilous abuse of a judge as a judge. We have, therefore, to deal with it as a case of contempt, and we have to deal with it *brevi manu*. This is not a new-fangled jurisdiction; it is a jurisdiction as old as the common law itself, of which it forms a part; it is a jurisdiction, however, to be exercised with scrupulous care; to be exercised only when the case is clear and beyond reasonable doubt, because if it is not a case beyond reasonable doubt, the courts will, and ought, to leave the Attorney General to proceed by criminal information."

A note to that case says that it is reported as showing that in England the court will still, when the circumstances demand its action, exercise its jurisdiction to punish on summary process the contempt of "scandalizing the court," though no contempt has been committed *ex facie* of the court, nor in respect of a case pending.

The common law of this subject has also been pretty fully considered in this country. Among the earlier cases is *Commonwealth* v. *Dandridge,* 2 Va. Cas. 408, decided in 1824. That was an attachment for contempt in insulting a judge as he was entering the court-house to take his seat upon the bench. The insult related to what the judge had done the term before in a case then tried and still pending. The respondent claimed that while the attaching power might be exercised for contempts touching the prospective conduct of a judge, it could not be exercised for contempts touching his past conduct. But the court said that as the authority and independence of the court might be equally assailed either way, the distinction was merely ideal. That case is referred to approvingly in *Burdett's Case,* 103 Va. 838, decided in 1904. There twelve indictments had been found against the respondent, to all of which he pleaded guilty and was fined and paid, which ended the cases. Directly after that, he caused to be published in a newspaper an article signed by him, in which he charged the judge not only with having acted towards him in respect of those cases in a harsh and an arbitrary manner, but also with having been actuated therein by vicious and corrupt motives. This was held a contempt at common law, and as being of that kind that consists of "scandalizing and defaming the court itself."

*State* v. *Morrill,* 16 Ark. 384, was an attachment for contempt in publishing an article intimating by implication that the court was induced by bribery to admit to bail on *habeas corpus* a prisoner charged with murder, but who, failing to furnish the bail required, was remanded, with the privilege of being brought again before the court if he could furnish the bail, which he failed to do. It was submitted by counsel for the defence, among other things, that the publication of a libel upon the official conduct of a court being an out-door affair, was not, by the common law, the subject of contempt; but if it was, that it was so only when the publication was made in reference to a cause pending in court, and that inasmuch as the publication there in question was made after the case had been determined and therefore was not pending, it did not fall within the definition of common law contempts. But the court said that the cases abundantly show that by the common law, courts have power to punish as for contempt, libelous publications upon

their proceedings, present or past, on the ground that they tend to degrade the tribunals, destroy public confidence in them and respect for their judgments and decrees, and most effectually to obstruct the free course of justice.

*In re Chadwick,* 109 Mich. 588, was *certiorari* to review the proceedings of a circuit court in which the respondent was adjudged guilty of contempt for writing and causing to be published a letter criticising a decree that the court had recently rendered, and charging the judge with submitting to private interviews with interested parties regarding the case pending his decision, and intimating unfairness and partiality at the hearing. The respondent claimed that the case to which the letter referred was not pending when it was published, and therefore that he could not be dealt with for contempt. But the court said that the case had not then reached the stage at which it could be said not to be pending; but that aside, the court went on to say that the statute did not in terms limit the power to punish for contempt to cases pending in court; that under the respondent's contention a party might threaten to do an act, or to charge corruption upon a judge, or that he had submitted to private interviews with the litigants, and if the case was then pending, he could be summarily punished for contempt; but if the decree had been pronounced, the judgment rendered, or the order made, he could the next moment do the same act or make the same statements with impunity, and leave the judge to the sole remedy of an action for libel or slander, which was too narrow a view of the law of contempt, and not sustained by the best-considered cases.

This subject was before the Supreme Court of Missouri in *State* v. *Shepherd,* 177 Mo. 205. There the respondent, in an article that he caused to be published in a newspaper of which he was the publisher and proprietor, charged the court and the members thereof with bribery and corruption in connection with the disposition of a certain case therein. On the return of a rule to show cause, the common law of contempt of court was thoroughly considered, and the conclusion reached that at that law, one kind of contempt is, scandalizing the court itself, and that it need not relate to a pending case, though there the case was still pending. The court said that the distinction Lord *Hardwick* makes in respect of contempts has been overlooked in

some of the cases, and hence the error they have fallen into of saying that the thing complained of must relate to a case pending in order to be a contempt; but that if the case is disposed of, then that will be no contempt which would have been one had the case been pending; that the theory of those cases is, that the act had a tendency to affect injuriously the rights of a party in pending litigation, or to embarrass, though it might not actually influence, the court in its determination; but that such cases fall under the second or the third class pointed out by Lord *Hardwick,* and do not cover the whole field, for there still remains the first kind of contempt, namely, that of scandalizing the court itself, in which the public is primarily interested, and as to which the injury is just as great whether it refers to a particular pending case or only to the court as an instrumentality of government.

*We hold, therefore, that it is a contempt at common law to scandalize a court of record by a newspaper publication in respect of its decision in a case no longer pending.*