## Paul Payne v. Jan W. Rozendaal, et al.
## Albert Trepanier, et al. v. Jan W. Rozendaal, et al.

[520 A.2d 586]

No. 83-563

Present: **Hill, Peck, Gibson and Hayes, JJ., and Keyser, J. (Ret.), Specially Assigned**

Opinion Filed September 26, 1986

Motions for Reargument Denied December 8, 1986

*Michael S. Brow* of *Sylvester & Maley, Inc.*, Burlington, for Plaintiff-Appellant Payne.

*Francis X. Murray* and *John T. Leddy* of *McNeil, Murray & Sorrell, Inc.*, Burlington, for Plaintiffs-Appellants Trepanier, et al.

*Dinse, Allen & Erdmann*, Burlington, for Defendants-Appellees Rozendaal, Nordic Ford, Inc., Nordic Holdings, Inc., and Cidron Ford, Inc.

*Alan. D. Port, William E. Roper*, and *John T. Sartore* of *Paul, Frank & Collins, Inc.*, Burlington, for Defendants-Appellees Getting Organized, Inc. and Styles.

**Hill, J.** The plaintiffs, all former employees or representatives of former employees of Nordic Ford, Inc., commenced an action, in superior court, against the defendants. The plaintiffs claimed in Count I of their complaint that they were discharged from their employment solely on the basis of their age, and that such discharge is in contravention of state law. Pursuant to a motion for summary judgment filed by the defendants, the court dismissed this claim of the plaintiffs because it found no state law in existence at the time of the discharge which would have restricted the defendants' right to discharge the plaintiffs on the basis of their age. The court also dismissed plaintiffs' claims for inten-

tional and negligent infliction of emotional distress and the claim for the wrongful death of one plaintiff as well as that plaintiff's spouse's claim for loss of consortium and consequential damages. The court dismissed these claims because it determined they could not be sustained in the absence of a viable claim for a wrongful discharge. Because we find that the plaintiffs presented a viable claim for recovery under state law for wrongful discharge, we reverse the superior court's dismissal of these claims.

The plaintiffs also alleged that defendants, Getting Organized, Inc. and its agent, Tommy Styles, tortiously interfered with the plaintiffs' employment contracts, by advising Nordic Ford, Inc. to discharge the plaintiffs because of their age. These defendants moved to dismiss this claim, or to have summary judgment granted in their favor, because they claimed they were privileged to act as they did. The court denied the motion after determining that justification for an interference with a contractual relationship is an affirmative defense, and that as a matter of law, the defendants had not established the defense of justification. We agree and affirm the superior court's denial of summary judgment on this claim.

## I.

We will first address the plaintiffs' appeal from the granting of summary judgment, in favor of the defendants, on all but one count of the plaintiffs' complaint.

On appeal from an order granting summary judgment, we must assume that the facts asserted by the nonmoving party, if supported by affidavits or other evidence, are true. *Braun* v. *Humiston*, 140 Vt. 302, 306, 437 A.2d 1388, 1389 (1981). When viewed in this light, the facts are as follows.

In the late fall of 1979, automobile sales of Ford Motor Company were on a decline nationwide. At this time, Nordic Ford, Inc. had a large inventory of 1979 automobiles. With interest rates high at this time, and a general slowdown in the national economy, Nordic was forced to sell its 1979 automobiles with a small margin of profit. Consequently, Nordic's profits for 1979 were lower than expected.

Early in 1980, Nordic's president, Jan Rozendaal, sought the advice of an "efficiency firm" from Birmingham, Alabama named Getting Organized, Inc.. Tommy Styles, a representative from

this firm, visited Nordic and interviewed a number of Nordic's employees. At the conclusion of a day of interviews, Styles met with Rozendaal and Nordic's general manager, Albert Trepanier. Styles said to the two of them that Nordic's new and used car departments had "a retirement home image" with only two employees age thirty or under and with one employee who was sixty-seven years old. Styles then recommended that he be allowed to change this. He suggested he use people from his firm to interview new people and replace the current employees with "young go-getters."

The following day, Trepanier met with Rozendaal and Rozendaal told Trepanier that he thought Styles' advice was good and that "we will do what he said." Rozendaal also informed Trepanier that Styles had recommended that Trepanier be fired, along with the others. Trepanier then resigned, refusing to fire the other employees. Six of Nordic's employees, all over age fifty, were then fired. The employees retained by Nordic were all considerably younger.

For the purposes of ruling on the motions for summary judgment, the parties conceded that all the employees were dismissed solely on the basis of age, and that all the employees were working at Nordic under an "at will" employment contract. Thus no factual questions remained which would preclude an order of summary judgment being entered. V.R.C.P. 56.

In Vermont, under an "at will" employment contract, an employee may be discharged at any time with or without cause, "unless there is a *clear and compelling* public policy against the reason advanced for the discharge." *Jones* v. *Keogh*, 137 Vt. 562, 564, 409 A.2d 581, 582 (1979) (emphasis in original). The plaintiffs claim that a discharge from employment solely on the basis of age contravenes a clear and compelling public policy. We agree.

Although the parties to an at will employment contract necessarily have substantial leeway in terminating their contract, such rights are not absolute. Courts vary on the extent to which considerations of public policy will curtail an employer's right to discharge an at will employee. See *Kovalesky* v. *A.M.C. Associated Merchandising Corp.*, 551 F. Supp. 544, 547-48 (S.D.N.Y. 1982) (under N. Y. law, discharge must contravene specific public policy clearly expressed in laws, executive orders, regulations or constitution); *Wagenseller* v. *Scottsdale Memorial Hospital*, 147 Ariz. 370, 378-79, 710 P.2d 1025, 1033-34 (1985) (constitution,

statutes and court decision form basis of public policy); *Palmateer* v. *International Harvester Co.*, 85 Ill. 2d 124, 130, 421 N.E.2d 876, 878-79 (1981) (discharge may contravene public policy not expressed in specific statutory or constitutional provisions); *Martin* v. *Platt*, 179 Ind. App. 688, 691-93, 386 N.E.2d 1026, 1028 (1979) (public policy exceptions limited to legislative directives); *Cloutier* v. *Great Atlantic & Pacific Tea Co.*, 121 N.H. 915, 922, 436 A.2d 1140, 1144 (1981) (public policy exceptions not limited to statutory pronouncements and may be based on nonstatutory policies); *Brockmeyer* v. *Dun & Bradstreet*, 113 Wis. 2d 561, 573, 335 N.W.2d 834, 840 (1983) (discharge must be "contrary to a fundamental and well-defined public policy as evidenced by existing law.").

Defendants argue that there is no public policy in Vermont prohibiting the discharge of an at will employee solely on the basis of age because at the time of the discharge, there was no statutory directive concerning age discrimination. It was not until the year following the plaintiffs' dismissals that the Vermont Legislature amended the Vermont Fair Employment Practices Act and made it an unlawful employment practice to discriminate against any individual on the basis of age. 21 V.S.A. § 495.

We do not find the absence of a statutory directive concerning age discrimination to be dispositive of whether a public policy against such practices existed at the time of the discharges. As the Supreme Court of Ohio stated in *Pittsburgh, Cincinnati, Chicago & St. Louis Railway* v. *Kinney*, 95 Ohio St. 64, 115 N.E. 505 (1916):

> In substance, [public policy] may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.
>
> Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people—in their clear consciousness and conviction of what is naturally and inherently just and right be-

tween man and man. It regards the primary principles of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our body politic. When a course of conduct is cruel or shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute, or decree of court. It has frequently been said that such public policy, is a composite of constitutional provisions, statutes, and judicial decisions, and some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination. When a contract is contrary to some provision of the Constitution, we say it is prohibited by the Constitution, not by public policy. When a contract is contrary to a statute, we say it is prohibited by a statute, not by a public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy. Public policy is the cornerstone—the foundation—of all Constitutions, statutes, and judicial decisions; and its latitude and longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on matter of public policy? There was no precedent for it, else it would not have been the first.

*Id.* at 68-69, 115 N.E. at 507.

In accepting this definition of "public policy," we necessarily reject defendants' argument, and the holdings of some courts, that the public policy exception to at will employment contracts must be legislatively defined. See, e.g., *Kovalesky, supra; Martin, supra; Brockmeyer, supra*. Statutes may themselves modify the at will employment doctrine. E.g., 29 U.S.C. § 623 (federal law prohibiting age discrimination); 21 V.S.A. § 495 (Vermont Fair Employment Practices Act). Such modifications, however, are separate from any public policy exception. In the absence of a state statute providing a remedy for age discrimination in existence at the time of the discharges, we do not find that the *later* passage of such a statute preempts a common law cause of ac-

tion.* We also follow other courts in finding that the Federal Age Discrimination and Employment Act (ADEA), 29 U.S.C. §§ 621-634, does not preempt state causes of action for age discrimination. *Adler* v. *American Standard Corp.*, 538 F. Supp. 572 (D. Md. 1982); *Cancellier* v. *Federated Department Stores*, 672 F.2d 1312 (9th Cir.), *cert. denied*, 459 U.S. 859 (1982).

■ We hold today that the discharge of an employee solely on the basis of age is a practice so contrary to our society's concern for providing equity and justice that there is a clear and compelling public policy against it. This situation is unlike others in which this Court has declined to find the existence of a clear and compelling public policy. In *Jones* v. *Keogh, supra*, an employee brought an action against her employer claiming to have been wrongfully discharged in retaliation for asserting her rights in connection with vacation time and sick leave. *Jones, supra*, 137 Vt. at 563, 409 A.2d at 582. We said in that case that "[w]hile full employment and employer-employee harmony are noble goals to which society aspires, they alone do not present the clear and compelling public policies upon which courts have been willing to rely in upholding an action for discharge of an employee at will." *Id.* at 564, 409 A.2d at 582. Similarly, in *Brower* v. *Holmes Transportation, Inc.*, 140 Vt. 114, 435 A.2d 952 (1981), we found no clear and compelling public policy against the discharge of a "causal employee," hired to fill in for vacations and sick days, when no malice on the part of the employer was either asserted or shown. *Id.* at 116-17, 435 A.2d at 953-54. In both cases, redress was sought for private concerns for which courts have generally held no public policy exists against a discharge on such basis. E.g., *Roberts* v. *Atlantic Richfield Co.*, 88 Wash. 2d 887, 568 P.2d 764 (1977); see also *Wagenseller* v. *Scottsdale Memorial Hospital, supra*, 147 Ariz. at 379, 710 P.2d at 1034 ("Where the interest involved is merely private or proprietary, the exception does not apply.").

The instant case is different. Here we are faced with a matter of discrimination on the basis of age. Both the United States Congress and the Vermont Legislature have recognized the exis-

---

* Since no state statutory remedy was available for age discrimination at the time of the plaintiffs' discharges, we express no opinion here regarding the circumstances under which, or the factors to be taken into consideration for determining when, such a state statutory remedy preempts a common law cause of action for age discrimination.

tence of the problem of age discrimination and have taken action to provide remedies for such. 29 U.S.C. § 623; 21 V.S.A. § 495. In 1975, Governor Thomas Salmon, by executive proclamation, designated March 9-15 as "Older Worker Week." In so doing, he recognized the problem of age discrimination and stated that "the State of Vermont has initiated efforts to hasten elimination of an unrealistic bias against older workers . . . ." To fail to recognize a common law cause of action when there is a clear and compelling public policy against age discrimination and when there is no state statutory provision providing an avenue of relief for the plaintiffs would be to shirk our responsibility to recognize and act upon societal changes as they affect and help develop the law of this state as interpreted by its courts.

The superior court thus erred in dismissing plaintiffs' claims for wrongful discharge. Plaintiffs' other claims, which the court also dismissed because it determined they were dependent upon a valid claim for wrongful discharge, must now be reconsidered by the trial court in light of our holding today.

## II.

The second part of this opinion addresses the appeals taken by two of the defendants, Getting Organized, Inc. and Tommy Styles. In their complaint, plaintiffs alleged that the conduct of the two defendants in recommending that the plaintiffs' employment be terminated solely on the basis of age constituted a tortious interference with plaintiffs' contractual relationship with Nordic. As a proximate result of such actions, plaintiffs claim to have suffered loss of employment, irreparable financial harm and severe emotional and physical distress. Defendants moved to dismiss these claims. They argued that wrongfulness is an element in the tort of intentional interference with a contractual relationship, and that the plaintiffs failed to allege any wrongful conduct by the defendants. The trial court denied defendants' motion. It determined that "justification for interference in the business relations of another is an affirmative defense which the defendant has the burden of proving." It also determined that whether an occasion exists which justifies defendants' conduct is a question for the jury and that, consequently, summary judgment in favor of the defendants was inappropriate.

This Court has stated that "[e]xcept for special justification, the law has long recognized liability against one who intentionally intrudes to disrupt an existing contract relation." *Mitchell v. Aldrich*, 122 Vt. 19, 22, 163 A.2d 833, 835-36 (1960). Such liability is imposed even though "the contract is terminable at will or unenforceable against the promisor . . . ." *Id.* at 23, 163 A.2d at 836. Furthermore, "[j]ustification for interference in the business relations of another is an affirmative defense, and the intruder has the burden of proving his privilege to intervene. Whether an occasion exists which justifies the invasion of another's contract or business relations by the defendant is generally a question for the jury." *Id.* at 24, 163 A.2d at 836-37 (citations omitted).

■ Under the rule as stated in *Mitchell, supra,* and the authorities cited therein, it is clear that in Vermont, any justification for an intentional interference with a person's contractual relation with another must be set forth and proved by the defendant as an affirmative defense. Any further requirement that the plaintiff allege wrongful interference has been satisfied in this case insofar as the plaintiffs' complaint stated the defendants' actions were committed "knowingly, intentionally, wilfully, maliciously, [and] without just cause."

The plaintiffs having sufficiently alleged a tortious interference with their contractual relations with Nordic, and the defendants' defense of justification or privilege being a question for resolution by the jury, the superior court committed no error in denying defendants' motion for dismissal or summary judgment on this count of the plaintiffs' complaint.

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*

**Peck, J.,** dissenting. I cannot accept the result reached in this case by the majority. I am convinced that it has been determined *pietatis causa,* clearly so in my view, since it is contrary to recent, as well as long standing, precedential decisions of this Court relating to public policy and at-will employees. Today's decision also violates the statutory rights guaranteed by the legislature, as those rights existed at the time the plaintiffs' employment was terminated. The end result here is no compliment to the judiciary. Speaking figuratively, defendants went to bed knowing that they had fully complied with the law, both statutory and prece-

dential, only to wake up the next morning to learn that as they slept, this Court had ignored both statutes and precedent, and held *they*, the defendants, had acted illegally. Rulings like this do not inspire public confidence in, or respect for the judicial system, nor can it possibly engender any public feeling of security even when acting under the shield of legislative guarantees. It is ironic that if this ex post facto illegality lay in the field of the criminal law it would be unconstitutional. In the civil law, so it seems, our citizens have no protection against judicial whims.

We are not talking here about an action based on age, per se. The basis for defendants' action was a good faith effort, made on the recommendation of an expert consultant, to improve a declining business. I gather such efforts are frowned upon by the majority, if the action is sufficient in its consequences to appeal to the emotions. I believe the defendants' actions were entirely legal and proper; accordingly, I have no choice but to file this dissent.

## I.
### At Will Employment

It is not disputed by the parties, and it is acknowledged by the majority, that the employment of the plaintiffs was of indefinite duration and was, therefore, "at will." Nor can it be questioned that under the common law an employment at will is terminable by either the employee or the employer at any time.

> The contract of employment . . . being indefinite in duration, the doctrine in this country, laid down by a great majority of the courts having the question before them, is that it was a hiring at will, under which either party had the right at any time to terminate the employment.

*Mullaney* v. *C. H. Goss Co.*, 97 Vt. 82, 87, 122 A. 430, 432 (1923).

*Mullaney* was recognized as the law in Vermont and followed as recently as 1981 in *Brower* v. *Holmes Transportation, Inc.*, 140 Vt. 114, 116-17, 435 A.2d 952, 953-54 (1981). In *Jones* v. *Keogh*, 137 Vt. 562, 409 A.2d 581 (1979), a unanimous Court[1] also accepted and followed *Mullaney*. In *Jones*, plaintiff alleged that she had been wrongfully discharged without cause and that such discharge was motivated by bad faith, malice, and was in retaliation

---

[1] *Mullaney, Brower* and *Keogh* were all decided by a unanimous Court.

because she had asserted certain alleged rights. The unanimous opinion contains significant language, thus:

> Ever present in these opinions recognizing the common law rule is the concern that acceptance of a rule extending enforceable contract rights to an at will employee would destroy the *mutuality* of obligation extant in such employment relationships. (Emphasis added).

*Id.* at 563-64, 409 A.2d at 582. Thus, an at-will employee, regardless of his value to his employer, or the extent to which the latter needed or relied on his expertise, could quit at any time without notice and with impunity. Nevertheless, as a result of today's injustice, if he had been discharged by the employer, the latter will be subject to a civil action and damages if the discharge was without good cause. The "mutuality" of such consequences, in the absence of a proper statute, escapes me.

The Court in *Jones* held expressly that even if the plaintiff's claim of bad faith, malice and retaliation should prove to be the fact it would not aid her; the remedy lay only with the legislature: "This is not to say, of course, that the *legislature* could not provide the remedy plaintiff seeks." *Id.* at 564, 409 A.2d at 582 (emphasis added). Moreover, in *Brower, supra,* 140 Vt. at 117, 435 A.2d at 954, we recognized again that the "public policy" involved in these "at will" cases is primarily a concern of our legislature not the courts.

In the instant case there is no claim that the defendant employer was guilty of any bad faith, malice or retaliation, even if those factors are an appropriate concern for the courts in these cases. On the contrary the employer was motivated simply by a belief that replacement of plaintiffs with younger personnel might improve its public image and consequently contribute to a reversal of the decline which had been experienced in its business. Moreover, this was not done arbitrarily, but only after a study by, and the advice of, an outside business consulting firm which, without anything to the contrary appearing, must be presumed to have been qualified and to have entered upon its assignment without any preconceived notions as to the cause of the decline in business. From this it must also follow that the consultant, in a perfectly legitimate business, also acted in good faith. The majority, however, reaches the preposterous conclusion that even if the age of the plaintiffs was, in the consultant's valid and expert

judgment, a contributing factor, it was forbidden *by law* from saying so, and the employer likewise forbidden to act on it.

The absurdity of the holding is compounded by at least two facts: first neither the consultant nor the employer, guided by *Mullaney, Brower* and *Jones*, had any reason to know that what they were doing was illegal in any way; they were protected by both common law rights as enunciated by this Court, and by the statutes through which the legislature *expressly* affirmed those rights. Second, this Court indicated it will not limit the *Mullaney* rule even in the face of such egregious conduct as bad faith, malice or retaliation, *Jones* v. *Keogh, supra*, but now, in a masterpiece of illogical reasoning, the majority have no hesitation in doing so when an employer attempts, in *good faith*, to improve his business, while at the same time the majority would have upheld the right of these same employees to quit at any time, had that been the case, regardless of the effect on their employer's business.

It is bad enough when the majority, without any demonstrated qualifications to do so, arrogates to itself the power to determine public or social policy, i.e., to declare what the people need and demand, without any evidence, that such is in fact what the public wants, except its own purely subjective, sympathetic and emotional response. It becomes an egregious and an inexcusable abuse of judicial power when, as here, a court ignores or defies clear and specific legislative enactments which not only control the subject matter but demonstrate legislative preemption as well. Such action violates the principles of judicial restraint, and violates the constitutional doctrine of separation of powers.

At the time the plaintiffs were discharged the subject matter of this proceeding was controlled by at least two statutes, 21 V.S.A. § 495, and 21 V.S.A. § 495c. Both of these statutes were included in 21 V.S.A., chapter 5, subchapter 6, entitled "Fair Employment Practices." *At that time* § 495, to the extent it is relevant to this inquiry, read as follows:

> It shall be [an] unlawful employment practice, except where a bona fide occupational qualification requires persons of a particular race, color, religion, national origin, sex, or ancestry:
>
> (1) For any employer, employment agency or labor organization to discriminate against any individual because of his

race, color, religion, ancestry, national origin, sex, or place of birth;

Conspicuously absent from this clear and express list of prohibitions is "age."

Even if there were no more than this statute, the long established and applied maxim of statutory construction, *inclusio unius est exclusio alterius*,[2] should be more than sufficient to exclude (*exclusio*) age from consideration *by the courts* as a prohibited concern. The legislature had very carefully compiled its list of prohibitions, thus expressing clearly for the guidance of employers, employment agencies and labor unions as well as the courts, the limits within which the common law was to be modified. In 1909, this Court stated:

> [A]s said in *Dewey* v. *St. Albans Trust Co.*, 57 Vt. 332, 338,[3] speaking of the construction of statutes, "the rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language," and here is no certain implication of change, nor clear and unambiguous language of overturn.

*State* v. *Hildreth*, 82 Vt. 382, 384, 74 A. 71, 72 (1909).

Of further interest is a case decided as recently as last year; this Court pointed out that the legislature is not required to use words which *expressly* modify the common law if "its language is inconsistent with any other interpretation." *State* v. *Messier*, 145 Vt. 622, 627, 497 A.2d 740, 742 (1985). The flip slide of this coin, of course, is the instant case: the language of the controlling statutes are *not* inconsistent with common law as far as age is concerned; as noted above, they expressly *affirm* the applicable common law.

To the extent it addresses the rights of an employer to hire and discharge an at-will employee, the second statute referred to above (21 V.S.A. § 495c), reads:

> This subchapter shall not be construed as limiting the *rights* of employers to hire and fire . . . *as long as such rights are not exercised in violation of this subchapter.* (Emphasis added).

---

[2] The inclusion of one thing (in a statute) implies the *exclusion* of others.

[3] Decided in 1885. Opinion written by Justice Rowell (later Chief Justice).

This is a clear affirmation of the common law *rights* of employers to discharge at-will employees *except* when the termination, formerly proper under the common law, is prohibited *by statute*. No such statutory prohibition, based on age, existed at the time plaintiffs were terminated.

Nevertheless, reading these statutes together as being in pari materia, two conclusions are clear beyond argument. First, the legislature had not, at the time in question, included an employer's action based on an employee's age as legally discriminatory or as an "unlawful employment practice." That conclusion being so, it follows that, even without the provisions of § 495c, the common law right of termination at will was still the law on which employers, as well as attorneys, business advisors, trial courts and others, were fully entitled to rely.

Section 495 cannot be looked at in the sense of a statute which creates *exceptions* from some amorphous, subjective and undefined concept of legal discrimination. On the contrary, it is *inclusive* in nature; it is, in fact, definitional in the sense of what conduct *does* (or did then) constitute discrimination and, as a result solely of being *included* in the statute, became an "unlawful employment practice." It follows that any conduct proper under the common law and not included in § 495 is not, *by definition*, legally discriminatory. Age was not included.

There is a second conclusion which must be drawn from reading together §§ 495 and 495c. Since action by an employer, based on the age of an employee, was not *legally* discriminatory under § 495, a discharge based on age, however much subjective sympathy and emotion may dislike the result[4] did *not* violate any statute. The employer here was, therefore, *entitled* to rely on its common law rights. Its right to act as it did under common law had been expressly affirmed by the legislature, particularly by the language of § 495c. The majority has not only changed the common law, it has done so in open defiance of the legislative will.

Obviously, "the rights" reserved to employers under § 495c referred to the common law rights to hire and fire as they existed at the time in question. What other rights could possibly have been contemplated? We cannot be concerned here with what the legis-

---

[4] This language relating to decisions based on sympathy should be compared with the more sober language in *Jones*: "Nor is the fact that bad faith, malice and retaliation are motives . . . sufficient . . . ." 137 Vt. at 564, 409 A.2d at 582. What can be more subjectively objectionable than these motives?

lature did thereafter; § 495 did *not*, at that time, indicate what the majority claim for it, i.e., that an employer action based on age was, at the time plaintiffs were terminated, against public policy as established by the legislature.

The majority not only ignores §§ 495 (as it existed) and 495c, by relying on § 495 as it has been subsequently amended and now stands. Also ignored are the protections afforded preexisting statutory rights guaranteed by 1 V.S.A. § 214(b)(2), which, to the extent it is applicable here, reads:

> (b) The amendment . . . of . . . [a] statutory provision . . . shall not:
>
> . . . .
>
> (2) Affect any right, privilege, obligation or liability acquired, accrued or incurred prior to the effective date of the amendment . . . .

Since, as I indicated at the outset of this opinion, there is no doubt whatever that, *at the time* it occurred, the employer had an absolute right under the common law of master and servant, as affirmed by statute, to terminate plaintiffs' services as was done, that right existed independently of any recommendation by the consultant. Any subsequent amendments to the discrimination statutes had no effect on preexisting statutory rights.

1 V.S.A. § 214(b)(2) is, in the context of this case, in pari materia with 21 V.S.A. §§ 495 (as it existed at the material time) and 495c. Taken together, or indeed almost individually, these provisions demonstrate irrefutably the correctness of the lower court's ruling, as well as the egregious and unjust result reached by the majority. This result not only ignores the express directives of the statutes, it usurps the primary rights and powers of the legislature to determine public policy.

## II.
### Third Party Intrusion

If it is possible, the majority's decision on the second issue is even more regrettable than the first. Its primary fault lies in the fact that it is plucked out of thin air and has no support that is applicable.

The opinion relies almost exclusively on *Mitchell* v. *Aldrich*, 122 Vt. 19, 163 A.2d 833 (1960). Even the most cursory review of

that case is sufficient to disclose that it is not in point. The factual situation is far different than in the case at bar, and the excerpts are quoted out of context.

In *Mitchell* the intruder was a *true* "third person." The contract involved was for the sale of cattle by a mortgagor. The "intruder" was simply retained by the mortgagee bank to appraise the cattle. However, he became an intruder when he persuaded the seller to sell the cattle to him rather than the prospective purchaser under an agreement between the latter and the seller. This act was a clear interference with the contract; it had nothing whatever to do with the purpose for which the appraiser had been employed by the bank. The appraiser departed from the purpose of his employment and went off on a frolic of his own.

Quite the contrary is true here. Getting Organized, Inc. (consultant) was a legitimate business consultant. It was employed to make a study and recommendations which might, hopefully, reverse the decline in the employer's business. Unlike the defendant in *Mitchell*, consultant did nothing to advance its own separate interests outside the scope of the specific purpose for which it had been employed, and which it was qualified to perform. The majority confuse the issue as far as the consultant is concerned. It is not whether, as a matter of fact, the age of plaintiffs had an adverse effect on the "public image" and thus on the employer's business. The only question is whether consultant, as an expert in its field, was entitled, as a matter of law, to perform the very function it was employed and qualified to do; that is, to form an opinion as to the factors contributing to the business decline, and to make recommendations based thereon. The majority holds that no such right or privilege exists in Vermont. However, this is contrary to the great weight of authority. See *Kecko Piping Co.* v. *Town of Monroe*, 172 Conn. 197, 202, 374 A.2d 179, 182 (1977) (pursuant to its contract, architect was under an obligation to advise defendant Town as to suitability of contractors and subcontractors); *Olivet* v. *Frischling*, 104 Cal. App. 3d 831, 841, 164 Cal. Rptr. 87, 92 (1980) (agent may properly counsel the breach of a contract by his principal which he reasonably believes harmful to his employer's best interests, even if the breach itself by the principal may be tortious); W. Prosser, Law of Torts § 129, at 943-46 (4th ed. 1971), text and annotations.

Surely, this startling new law is a parody of any semblance of justice under the law. It holds that an expert, retained to perform

a function within the parameters of his expertise, must nevertheless remain dumb and withhold his opinion and advice, however legitimate (again that is not the issue), or be dragged before a court by anyone who is disgruntled by the opinion and recommendations, and seeks retribution.

Apparently it was agreed that plaintiffs were discharged "solely on the basis of their age." Whether that was a wise concession is irrelevant at this point; it must be taken as true as far as it goes; "but for" their age, it appears they would not have been terminated. Nevertheless this concession is only half the story as even the majority opinion recognizes. It was their age which, in the opinion of the consultant, was a contributing factor in the decline of the employer's business and, accordingly, led to the termination on that basis. This element of the case, although recognized by the majority and clearly evident on the record, is swept under the carpet and ignored by the majority.

## III.
## Summary

In summary, the majority's decision on this first issue is legal swashbuckling of the most unfortunate order. When we cut through the camouflage of policy, it stands exposed as an indication that no one is safe to act even under the supposed protection of the legislature, and even when a constitutional question is not an issue, from the ex post facto whims of the judiciary. It is simply not true as the majority state that, *at the time* of the employer's action here, the "Vermont Legislature [had] recognized the existence of a problem of age discrimination," at least in the context of the employer-employee relationship. That did not come until later. Yet the majority not only ignores § 495c, it *relies* on § 495 as it exists today, not as it was at the time plaintiffs were discharged.

Further, the sweeping statement that "[t]o fail to recognize a common law cause of action . . . would be to shirk our responsibility to recognize and act upon societal changes . . . ." is nothing but demagoguery couched in legalese. It is a high-sounding cover-up for what is really being said, that everyone but the courts are bound by legislative enactments; the courts are free to follow, ignore, amend or modify statutory rights as they wish. Here, the right of the employer to discharge the plaintiffs at will,

because of age or otherwise, was a *right* it had under the common law; it did *not* violate any provision of 21 V.S.A., chapter 5, subchapter 6. It was a right recognized and protected by § 495c. What other "rights" could § 495c possibly have referred to?

Conceivably, although I am not prepared to concede it, an argument could be made for a limitation of the common law here, *if* there existed no controlling statute. The majority commit the additional error of saying that no such statute existed. That conclusion is simply wrong; obviously § 495c has been pushed behind the policy smoke screen and ignored as an element of the case in its entirety as it appears in the record before this Court.

What I have written above concerning the rights of the employer under the common law, as affirmed and protected by the cited statutes in Titles 1 and 21, applies equally, of course, to consultant. Since the employer had the right under these precedents and statutes to terminate plaintiffs at will, the consultant did nothing illegal, particularly since, in its opinion, as an expert in the field, the employer's business was being adversely affected. Additionally, as a matter of law, under the undisputed factual pattern here, consultant was not an intruder within the contemplation of *Mitchell* v. *Aldrich, supra,* or any other case that I have discovered.