## Sharon and Robert Dulude v. Fletcher Allen Health Care, Inc.

[807 A.2d 390]

No. 01-090

Present: **Amestoy, C.J., Dooley, Johnson and Skoglund, JJ.**

Opinion Filed June 28, 2002

*Francis X. Murray*, South Burlington, for Plaintiff-Appellant.

*Andre D. Bouffard* and *Steven P. Crowther* of *Downs Rachlin & Martin PLLC*, Burlington, for Defendant-Appellee.

**Skoglund, J.** Appellant Sharon Dulude appeals a ruling of the Chittenden Superior Court granting Fletcher Allen Health Care's (FAHC) motion for summary judgment on claims of breach of contract, promissory estoppel, discharge in violation of public policy, intentional infliction of emotional distress (IIED), and defamation. Dulude argues that there are genuine issues of material fact as to: (1) whether FAHC's communications and personnel manual altered her employment from at-will to just cause; (2) whether FAHC had just cause for discharging her; (3) whether FAHC made promises to Dulude for just cause employment on which Dulude reasonably relied; (4) whether FAHC violated public policy in terminating Dulude's employment; (5) whether FAHC's actions were outrageous and caused her extreme emotional distress and whether such claim is time-barred; and (6) whether FAHC defamed Dulude and whether such claim is time-barred. We affirm.

The material facts are as follows. Dulude was employed as a nurse with FAHC[1] from July 1, 1991, to April 20, 1995. Dulude did not sign a contract of employment, and the duration of her employment was open-ended. In the fall of 1992, FAHC terminated Dulude for allegedly diverting narcotics, falsifying her patients' medical records, and failing to meet the standard of practice regarding the administration of medication. A medication and narcotic audit was performed by a committee comprised of the Head of Pharmacy at FAHC, the Vice President of Nursing, the Nurse Manager, and the Head of Human Resources. Based on their audits, the committee felt there was enough evidence to substantiate the fact that Dulude's narcotic practice was significantly different from her coworkers'. Dulude appealed her

---

[1] Fletcher Allen Health Care (FAHC) was still known as the Medical Center Hospital of Vermont (MCHV) when Dulude was first terminated in 1992. MCHV became FAHC just prior to Dulude's second termination in 1995. To avoid confusion, all reference herein will be to FAHC.

termination to FAHC's Vice President of Nursing, and FAHC reinstated her on November 23, 1992.

Dulude's letter of reinstatement noted that her pattern of medicating patients was distinctly different from other professional nurses on her unit and that she, as an individual, repeatedly signed out and documented the use of as many Percocet in twenty-four hours as all unit nurses combined. The letter acknowledged that Dulude and FAHC had discussed Dulude's philosophy of pain medication and that her return to work would be premised on specific conditions requiring her to receive supervision and education in the administration of narcotic drugs.

On April 12, 1993, a patient complained that Dulude repeatedly and strongly urged him to accept Percocet for pain, despite his refusal, to the point of making him feel harassed. The complaint resulted in a letter of understanding[2] dated May 17, 1993, which outlined a protocol requiring Dulude to discuss patients' pain medication needs with a support person and gain the support person's consent prior to administering any controlled substance. The letter concluded: "[f]ailure to comply with any aspect of this letter will result in further disciplinary action and may result in termination."

On June 25, 1993, a decision-making leave[3] was written for Dulude's failure to comply with the letter of understanding of May 17, 1993. Dulude, who was required to seek supervision and approval when dispensing medications, requested a nonsupport person to sign both the controlled substance record and the patient flow sheet while Dulude administered the medication. FAHC stated that continued employment was contingent on Dulude's compliance with the hospital policy with respect to controlled substances.

On October 29, 1993, a second letter of understanding noted Dulude's compliance with the decision-making leave of June 1993 and her general improvement in pain management skills. The letter stated that: "Any change in her pattern of administration which is deemed aberrant or any questionable issues surrounding the administration of

_____

[2] A letter of understanding, according to FAHC's Employee Relations Corrective Action policy F-6, is a letter or document regarding poor performance or policy violation(s). In a progressive format this step would follow a verbal counseling or, for a more serious situation, could be the starting point.

[3] A decision-making leave or day is a day off without pay, during which the employee should assess his/her commitment to the job and whether they are meeting performance expectations. The employee receives a letter documenting the poor performance and must then indicate his/her intention to meet the expectations or resign from the position.

controlled substances for pain will be evaluated .... This may lead to further investigations and a reinstatement of restrictions." All restrictions were then removed.

On March 23, 1994, a third letter of understanding addressed a second incident where Dulude, who came on duty at 11:20 p.m., administered Percocet to a patient at 11:30 p.m. and again at 3:30 a.m. The patient was extremely nauseated and exhausted the next day. Dulude's nurse manager noted that these medication interventions were not appropriate. This third letter of understanding also referred to another audit that was done on Dulude's unit, the results of which showed that Dulude consistently administered more Percocet than any other nurse. The letter strongly suggested that she get help in understanding her method of administering pain medication. Dulude agreed to consult with an outside counselor regarding her "reasons for" and her "method of" administering pain medication.

In September 1994, Dulude's shift supervisor stated that there was still concern over Dulude's aberrant controlled substance administration pattern and advised Dulude that all nurses on the shift, including Dulude, should administer no more than fifteen to thirty-five percent of the total pain medication administered on the unit. In November 1994, FAHC called Dulude and informed her that her figures for a given week were at seventy-two percent and that she needed to lower her numbers.

On December 11, 1994, a third patient complained that his Tylenol had been substituted for Percocet on two occasions. Dulude argues that she never substituted Tylenol for Percocet and any suggestion that she did would never have occurred but for the fact that her reputation had been ruined by false accusations in 1992. Dulude contends that had FAHC conducted a competent investigation of the 1994 episode, it would have discovered that no substitution ever occurred.

Finally, by letter dated February 9, 1995, FAHC notified Dulude that her employment would be terminated effective February 15, 1995. The letter outlined the several instances of patient complaints discussed above. The letter also referred to various audits performed by nurse clinicians, managers and administrators, which confirmed that Dulude had continually dispensed and administered more Percocet than any other nurse on her unit. FAHC noted in the letter that none of their attempts to counsel and educate Dulude produced more than a temporary improvement in her narcotic administration

practices and that Dulude's practices created a level of patient risk that could not be tolerated at FAHC.

Dulude appeared before the grievance panel on March 9, 1995. The grievance panel denied her grievance on March 13, 1995. Dulude appealed this denial to the president and met with the president's designee on April 12, 1995. She received a certified letter from the designee on April 20, 1995, informing her that her appeal had been denied.

On April 17, 1998, Dulude filed a wrongful employment termination action and related tort claims in superior court against FAHC. The case was removed to federal court because of two federal constitutional claims: denial of due process and equal protection. These two claims were disposed of by the federal district court before the case was remanded to the superior court for resolution of Dulude's state claims. The issues presented to the superior court for resolution included: breach of contract, promissory estoppel, discharge in violation of public policy, intentional infliction of emotional distress, defamation, and loss of consortium.

On January 9, 2001, the superior court granted FAHC's motion for summary judgment on the breach of contract, promissory estoppel and defamation issues. FAHC filed a motion to amend the summary judgment decision, and the court made a later entry on March 8, 2001, dismissing Dulude's remaining claims of intentional infliction of emotional distress and discharge in violation of public policy. The superior court also dismissed the loss of consortium claim as a derivative claim that failed upon dismissal of the primary claims. Dulude then appealed the decision granting summary judgment to FAHC, except with respect to the loss of consortium claim.

In reviewing a grant of summary judgment, this Court applies the same standard as the trial court. *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 17-18, 665 A.2d 580, 582 (1995). Summary judgment is appropriate only when the moving party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. *Samplid Enters., Inc. v. First Vt. Bank*, 165 Vt. 22, 25, 676 A.2d 774, 776 (1996). The nonmoving party may survive the motion if it responds with specific facts raising a triable issue and is able to demonstrate sufficient evidence to support a prima facie case. *State v. G.S. Blodgett Co.*, 163 Vt. 175, 180, 656 A.2d 984, 988 (1995). If the nonmoving party fails to establish an essential element of its case on which it has the burden of proof at trial, the moving party is entitled to summary judgment as a matter of law. *Id.* In the present action,

FAHC is entitled to summary judgment as a matter of law on all counts.

## I.

Dulude first argues that the court erred in deciding on summary judgment the question of whether the employee manual and certain oral assurances made by FAHC amounted to modification of her at-will employment status to the effect of prohibiting her termination without cause. The court held that Dulude's evidence did not show, as a matter or law, that a modification had occurred. She claims that the question should have been submitted to a jury for determination.

As an employee hired for an indefinite period, Dulude is presumed to have been an at-will employee. *Taylor v. Nat'l Life Ins. Co.*, 161 Vt. 457, 462, 652 A.2d 466, 470-71 (1993). Dulude can overcome this presumption by presenting evidence that FAHC unilaterally modified her at-will status with an express or implied contract of employment that provided for termination only for cause. *Id.* Even if we assume, however, that a just cause term of employment was implied from the FAHC handbook or employment policy, we conclude, upon review of the existing record, that there is no genuine issue of material fact as to the reasons for FAHC's decision to terminate Dulude and that those reasons amounted to just cause as a matter of law for Dulude's discharge.

In a case governed by a specific just cause clause in a collective bargaining agreement, this Court defined "just cause" for employment termination as some "substantial shortcoming detrimental to the employer's interests, ... which the law and a sound public opinion recognize as a good cause for his dismissal." *In re Brooks*, 135 Vt. 563, 568, 382 A.2d 204, 207 (1977) (internal citations omitted). The ultimate criterion of just cause is whether the employer acted reasonably in discharging the employee because of misconduct. *Id.* To be upheld, discharge for just cause must meet two criteria of reasonableness: one, that it is reasonable to discharge the employee because of certain conduct, and the other, that the employee had fair notice, express or fairly implied, that such conduct would be grounds for discharge. *Id.* at 568, 382 A.2d at 207-08; *Nadeau v. Imtec, Inc.*, 164 Vt. 471, 475, 670 A.2d 841, 844 (1995). This case does not present an issue of whether the employee had adequate notice. Thus, the Court is concerned only with the determination that there existed just cause for Dulude's termination.

It is undisputed that Dulude was terminated for performance reasons related to her questionable narcotic administration practices and patient complaints. Dulude does not claim that the reasons stated by FAHC for the termination decision were not the employer's true motivating factors. Rather, she simply claims that her narcotic administration practices were more appropriate. From this assertion she claims that there exists a question of material fact as to whether or not FAHC had just cause to dismiss her and that she is entitled to have a jury make this factual determination.

The undisputed facts in this case establish that FAHC, under an objective good faith standard, had just cause to terminate Dulude's employment. FAHC, concerned at the very least with Dulude's failure to comply with the multiple letters of understanding, and with a potential threat to patient safety looming, warned Dulude repeatedly that her narcotic administration practices were inconsistent with accepted practices. In addition, there were three patient complaints, all relating to Dulude's narcotic administration, which raised questions about her competence in this area. These long-standing performance issues, made known to Dulude through letters of understanding and conversations with her supervisors, coupled with a series of incidents involving questionable narcotic administration, constitute substantial evidence to support FAHC's decision to terminate her. Dulude does not dispute that she knew FAHC was concerned with her narcotic administration practices and that failure to change her methods would put her employment with FAHC at risk. Nor does she deny she was warned. She simply continues to assert that her philosophy of narcotic administration is best. Dulude has raised no issue of material fact concerning FAHC's reasonable belief that her administration of narcotics was faulty. As the employer with ultimate responsibility, FAHC may, indeed must, set its own standards for drug administration.

## II.

Dulude next argues that the court erred by granting summary judgment on her promissory estoppel claim. We have held that the doctrine of promissory estoppel may modify an employment contract that is otherwise terminable at will and provide a remedy for a wrongful discharge. *Foote v. Simmonds Precision Prods. Co.*, 158 Vt. 566, 571, 613 A.2d 1277, 1280 (1992). We need not address this claim. Even if an at-will contract was modified in the instant case, either by unilateral modification by the employer or by promissory estoppel,

Dulude still failed to show there was a genuine issue of material fact relating to a breach of an implied just cause employment contract.

## III.

▇ Dulude also claims that her termination constituted a wrongful discharge in violation of public policy. We have held that an at-will employee can maintain a separate, independent claim for wrongful discharge in violation of public policy. *Payne v. Rozendaal,* 147 Vt. 488, 491, 520 A.2d 586, 588 (1986). In Vermont, under an at-will employment contract, an employee may be discharged at any time with or without cause, "unless there is a *clear and compelling* public policy against the reason advanced for the discharge." *Jones v. Keogh,* 137 Vt. 562, 564, 409 A.2d 581, 582 (1979) (emphasis in original). Dulude claims that a discharge from employment on the basis of her alleged aberrant narcotic administration contravenes a clear and compelling public policy that providers who properly medicate their patients will not be discharged for complying with a duty to do just that. We disagree.

▇ In *Payne,* this Court defined public policy as "the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like." 147 Vt. at 492, 520 A.2d at 588 (quoting *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. v. Kinney,* 115 N.E. 505, 507 (Ohio 1916)). As a matter of law, Dulude's professional disagreements are insufficient to support a public policy claim. As a licensed hospital in Vermont, FAHC has the ultimate responsibility to provide for, and protect, its patients, and to set its own standards for safeguarding the life and health of the people of this state. Its decision to terminate Dulude's employment due to failure to comply with hospital policy cannot support her public policy claim. Even if Dulude was properly medicating her patients, we cannot find that her termination is so contrary to society's concern for providing equity and justice that there is a clear and compelling public policy against it. See *Aiken v. Employer Health Serv., Inc.,* No. 95-3196, 1996 WL 134933, at *6 (10th Cir. March 23, 1996) (stating that there is no "public policy which prohibits an employer from terminating a health care employee over a disagreement or difference of professional judgment where the judgment of each is within the bounds of reasonable care") (internal quotation marks omitted). We conclude that FAHC is entitled to judgment as a matter of law on Dulude's claim of wrongful discharge in violation of public policy.

## IV.

Dulude's next claim is that FAHC's actions, which caused Dulude's wrongful discharge, were outrageous and caused her severe emotional injury. The trial court ruled that this claim had no merit. FAHC contends that Dulude's claim for IIED filed on April 17, 1998, is time-barred, or in the alternative, that there is insufficient evidence to support a claim that its conduct was outrageous. We affirm the trial court's decision to grant summary judgment to FAHC on this issue.

A claim for IIED exists when the defendant's extreme and outrageous conduct, done intentionally or with reckless disregard of the possibility of causing emotional distress, causes the plaintiff to suffer extreme emotional distress. *Farnum v. Brattleboro Retreat, Inc.*, 164 Vt. 488, 497, 671 A.2d 1249, 1256 (1995) (citing *Denton v. Chittenden Bank*, 163 Vt. 62, 66, 655 A.2d 703, 706 (1994)). A plaintiff's burden on a claim of IIED is "a heavy one." *Gallipo v. City of Rutland*, 163 Vt. 83, 94, 656 A.2d 635, 643 (1994). The conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable. *Denton*, 163 Vt. at 66, 655 A.2d at 706. It is for the court to determine as a threshold question whether a jury could reasonably find that the conduct at issue meets this test. *Jobin v. McQuillen*, 158 Vt. 322, 327, 609 A.2d 990, 993 (1992) (citing Restatement (Second) of Torts § 46, comment h (1965)).

Dulude has made the following claims in support of her action for IIED. Viewed in a light most favorable to her, she contends that FAHC acted outrageously when it: (1) allowed a nurse with a known chemical dependency to supervise and discharge Dulude in 1992; (2) turned a patient's general concern about Tylenol being substituted for his Percocet into a complaint against Dulude; (3) terminated Dulude in 1995 because its quota method of assessing Dulude's medication administration was unprofessional and unreasonable; and (4) conducted the disciplinary proceedings leading up to the discharge and finally discharged her.

FAHC's alleged conduct falls far short of being so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community. First, Dulude has failed to present any evidence that offers a causal connection between her discharge and resulting emotional distress and her nurse manager's chemical dependency problem in 1992. She offers no

evidence to suggest that the 1992 nurse manager's investigation and Dulude's subsequent termination were not the result of the manager's duty to investigate reports of improper narcotic administration practices. As a matter of law, such action by the nurse manager and FAHC was not unreasonable nor was it outrageous. Second, FAHC's investigation into a patient complaint about drug administration on Dulude's unit is not only reasonable, but expected of a licensed hospital. Third, any termination of Dulude for failure to conform her narcotic administration practices to FAHC's requirements does not amount to a violation of an implied just cause employment contract, let alone behavior that is so severe a reasonable person should not be expected to endure it.

Finally, this Court has also held that mere termination of employment will not support an emotional distress claim, but if "the manner of termination evinces circumstances of oppressive conduct and abuse of a position of authority vis-à-vis plaintiff, it may provide grounds for the tort action." *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296, 576 A.2d 441, 448 (1990); see also *Goosens v. AT&T Corp.*, No. EP-00-CA-002-DB, 2000 WL 33348222, at *3 (W.D.Tex. April 3, 2000) (simply terminating an employee without more cannot amount to IIED). Dulude's allegations, taken as true, fail to demonstrate that FAHC's actions during the actual grievance procedure and termination process were extreme and outrageous. See *Crump*, 154 Vt. at 296-97, 576 A.2d at 449 (holding that there was sufficient evidence to go to a jury on an IIED claim when an employee with eighteen years of service was summarily fired after being falsely accused of theft, kept in a three hour meeting with no opportunity to leave or eat lunch, and badgered to sign a confession).

This Court has held that absent at least one incident of behavior that transcends the ignoble and vast realm of unpleasant and often stressful conduct in the workplace, incidents that are themselves insignificant should not be consolidated to arrive at the conclusion that the overall conduct was outrageous. *Denton*, 163 Vt. at 67, 655 A.2d at 706. Even were we to view FAHC's conduct in its entirety, we conclude that a reasonable jury with proper instruction on the law could not find FAHC's behavior to be outrageous. Accordingly, we affirm the grant of summary judgment on this claim.

## V.

Finally, Dulude appeals the trial court's grant of summary judgment on her defamation claim and argues that such claim is not

time-barred. The parties are in agreement that a defamation claim must be brought within three years after the cause of action accrues. 12 V.S.A. § 512(3). A cause of action in defamation is generally said to accrue on the date of publication or circulation. See *Fleischer v. Inst. for Research in Hypnosis*, 394 N.Y.S.2d 1, 2 (App. Div. 1977); *Digital Design Group, Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 839 (Okla. 2001). Some jurisdictions, however, hold that the accrual of a cause of action in defamation may be deferred until the plaintiff discovers or, through the exercise of reasonable care and diligence, should have discovered the nature of the defamatory communication. See *Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 394 (Tex. App. 1993). These courts tend to apply this "discovery rule" in limited situations, such as when the publication is likely to be concealed from the plaintiff or published in a secretive manner. *Digital Design Group, Inc.*, 24 P.3d at 839. In keeping with this Court's well-settled rule governing the accrual of actions in general, see *Agency of Natural Resources v. Towns*, 168 Vt. 449, 452, 724 A.2d 1022, 1024 (1998) (a cause of action is generally said to accrue upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery), we too choose to apply the discovery rule to defamation claims.

Dulude argues that FAHC first defamed her in November 1992 when her supervisor published a false report that stated that Dulude diverted narcotics and falsified records. FAHC then allegedly republished this defamatory statement to a patient and nurse in December 1994. Dulude filed her defamation claim on April 17, 1998. Dulude's claim will therefore be time-barred if, prior to April 17, 1995, she had discovered facts constituting the basis for a claim of defamation, or facts existed that were sufficient to put a person of ordinary intelligence on inquiry which, if pursued, would lead to the discovery of such facts.

On March 9, 1995, in her written submission to the grievance panel, Dulude stated that "her reputation was ruined in 1992 and 1993 by the false statements of ... my unit supervisor." Dulude was admittedly aware of the alleged defamatory statements made in 1992 more than three years before she filed this present action, and therefore her claim with respect to this alleged defamation is time-barred.

In her submission to the grievance panel, Dulude also stated that the nurse who worked with the patient to whom the statement was

allegedly republished purposely solicited a complaint from him because "she was aware of my reputation caused by ... false accusations against me in 1992 and 1993." Dulude argues, however, that it was reasonable for her not to have discovered the second republication until the discovery deposition of the patient on January 22, 1999, because FAHC had erected an "intervening screen" which hid any wrongdoing. Dulude relies on *Jones v. Pinkerton's, Inc.*, 700 S.W.2d 456, 459 (Mo. Ct. App. 1985). In *Jones*, the employer expressly prevented the plaintiff from learning about an investigation and report, and the court held that such factors that are outside of the plaintiff's control may prevent the plaintiff from knowing he or she had suffered a legal harm. *Id.* at 457, 460. In the instant case, FAHC took no steps to hide any report or patient complaint and specifically referenced this particular patient in its termination letter on February 9, 1995. In addition, Dulude interviewed the patient involved in January 1995 and had the opportunity at that time to discover facts that would lead to the discovery of the present claim. Through the exercise of reasonable care and diligence, Dulude should have discovered the nature of the defamation claim before April 17, 1995. Her claim, therefore, is time-barred.

Dulude also maintains that the defamatory statements were repeated to a fellow nurse on their unit and that she could not have discovered such defamatory statements until the nurse's deposition on May 18, 1999. On that date, the nurse testified that she learned of the reason for Dulude's termination "from what was said on the unit." We find that such rumors regarding Dulude's termination are insufficient to establish a claim of defamation against FAHC. See *Szot v. Allstate Ins. Co.*, 161 F. Supp. 2d 596, 607-09 (D. Md. 2001) (holding that references to the "rumor mill," created by the plaintiff's former peer's sheer speculation as to the grounds for her termination, without more, is insufficient to establish a claim of defamation against employer); *Elicier v. Toys "R" Us, Inc.*, 130 F. Supp. 2d 307, 311 (D. Mass. 2001) (holding that the mere fact that some Toys "R" Us employees may have heard a rumor that the plaintiff was terminated for dealing drugs does not prove reckless publication).

*Affirmed.*