Nelson v. Town of St. Johnsbury Selectboard, No. 93-4-12 Cacv (Teachout, J., August 7, 2013)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                       **CIVIL DIVISION**
**Caledonia Unit**                                       **Docket No. 93-4-12 Cacv**

**RALPH NELSON,**
    **Plaintiff**

    **v.**

**TOWN OF ST. JOHNSBURY**
**SELECTBOARD,**
**ROD LAMOTHE,**
**KEVIN ODDY,**
**ALAN RUGGLES,**
**JAMES RUST, and**
**BERNARD TIMSON,**
    **Defendants**

### DECISION ON MOTIONS

The Plaintiff in this case is a former town manager who seeks declaratory and injunctive relief as well as monetary damages from the Town of St. Johnsbury and individual members of the Selectboard for wrongful termination and deprivation of employment rights without due process. Before the Court at this time are Plaintiff's motion to amend his complaint and Defendants' motions for judgment on the pleadings and summary judgment.

### Facts

The following facts are undisputed unless unclear, in which case Plaintiff's facts are used. In August 2010, the Town of St. Johnsbury hired Plaintiff Ralph Nelson to serve as its town manager on an interim basis. On September 27, 2010, his interim status ended and he was hired as Town Manager by vote of the Selectboard. There is no evidence of any specific employment terms negotiated, discussed, or agreed upon between Plaintiff and the Selectboard. On April 3, 2012, his employment was terminated by the Selectboard.

Plaintiff claims that he was advised by Edward Zuccaro, the Town attorney, that he could only be removed for serious misconduct. He claims that Mr. Zuccaro told him this in conversations on three different occasions. The first was "around the time" of the September 27th hiring. The second was on July 18, 2011, and the third was after March 16, 2012. There is no evidence that any member of the Selectboard was present during these conversations.

Plaintiff testified that in the first conversation Mr. Zuccaro told him, with respect to job protections, that

it was an extremely high bar. . .His comment was that I would have to find – he would have to – somebody would have to walk into my office and find me with my hand in the cookie jar and another body part in an improper place simultaneously, and then he went on to tell me about a letter that he wrote for years and years on behalf of a former town manager that was distributed to the select board on an annual basis that explained to them this very fact and tried to – and somehow laid out the statute with regard to responsibilities for the select board, and he offered me on ten occasions to write this letter and allow me to distribute it to the selectmen.

Plaintiff's Exhibit 4, Deposition of Ralph E. Nelson, Jr., pages 128-129.

Plaintiff testified that the second conversation took place in July of 2011 after he and his wife had made an offer to buy a house in Danville. Attorney Zuccaro dissuaded him from doing so and told him he should live in St. Johnsbury:

I said, Well, . . .if we withdraw this offer and we move to St. Johnsbury, I still want to know I'm protected, because, you know, the market in – in St. Johnsbury is not very good, the resale market, and that's when Ed repeated this for the second time. . . And then I said to him, I think I might need the Dave Clark letter. At some point he said, You just ask me anytime and I'll do it.

*Id.* at 131. There is no evidence that Mr. Nelson ever asked Mr. Zuccaro to write such a letter. The third conversation occurred after the March 16, 2012 letter described below, when relations between Plaintiff and the Selectboard had deteriorated.

One of the major initiatives commenced while Mr. Nelson was Town Manager was the renovation and lease of the Pomerleau Building, which had been donated to the Town. Mr. Nelson presented the Pomerleau Building project to the electorate five to six times during public meetings before a vote was taken on a bond to fund the project. Mr. Nelson estimated that the project would cost $1.4 million, and the voters approved a bond in that amount.

Defendants allege that after the vote approving the bond, Mr. Nelson revised the estimated cost of the project to $1.8 million. Mr. Nelson states that the bond presented to the voters was for a substantially different analysis of the project, which developed over time, and that he accurately represented this to the voters and the Selectboard at appropriate times.

At some point, the Northern Community Investment Corporation (NCIC) expressed interest in renting space in the Pomerleau Building. Mr. Nelson thought that if NCIC were to become a tenant in the building, it would make the building much more profitable. At the time, the building's operational expenses exceeded the amount of rent the Town collected from the two tenants who occupied space in the building. In October 2011, Mr. Nelson reported to the Selectboard that if NCIC leased space in the building, NCIC would pay market rates and the building would become self-sufficient. Mr. Nelson told the Selectboard that he thought that NCIC's payments would make up the difference between the income from the existing tenants and the expenses of maintaining the building.

Mr. Nelson entered into lease negotiations with NCIC in December 2011. A representative of NCIC sent Mr. Nelson proposed language for the lease, which Mr. Nelson received on December 28, 2011.

In January 2012, Mr. Nelson submitted the proposed NCIC lease to Town Counsel. Mr. Nelson skimmed the lease and was confident that the terms of the proposed NCIC lease would make the Pomerleau Building profitable. The Selectboard claims that it asked Mr. Nelson several times if there was a lease document, but he denied that there were any lease documents.

During a public meeting on February 27, Mr. Nelson told the Selectboard that under the terms of the proposed lease, NCIC would rent more than 3,729 square feet in the Pomerleau Building for more than $12 per square foot for more than 10 years. The Selectboard claims that Mr. Nelson told them that NCIC had agreed to contribute more than $100,000 to the cost of renovations. Mr. Nelson denies making this representation. In fact, NCIC had agreed to pay $100,000 as an advance on rent to help cover the cost of renovations, but that figure was not intended by NCIC to be a contribution. The actual square footage leased to NCIC in the Pomerleau Building turned out to be 4,375 square feet.

The renovations to the Pomerleau Building began on February 1, 2012, and included improvements that NCIC had requested in anticipation of signing a lease. Mr. Nelson admits that there was no alternate plan if NCIC decided not to lease space in the building. However, Mr. Nelson authorized the renovations to begin in the belief that the NCIC lease would be profitable.

On March 16, 2012, Selectman James Rust spoke with Mr. Nelson in his office. During this meeting, Mr. Rust informed Mr. Nelson that he was there on behalf of the Selectboard and explained that the Selectboard wanted to inquire into Mr. Nelson's performance as Town Manager. He gave Mr. Nelson a letter that stated "[t]he Selectboard has concerns that it will be inquiring about" and that Mr. Nelson had an obligation to cooperate with the inquiry. The letter stated that "[r]efusing to answer, answering incompletely, or answering untruthfully, questions relating to work is considered misconduct for which an employee may be disciplined up to and including dismissal." The letter did not state what the inquiry was about.

Selectman Kevin Oddy was primarily responsible for conducting the inquiry into Mr. Nelson's performance. Mr. Oddy interviewed various town employees and residents and transcribed their statements. Mr. Nelson apparently was aware that statements were being taken during the inquiry.

Following his inquiry, Mr. Oddy drafted a list of issues concerning Mr. Nelson's performance, dividing them into "Serious, "Important," and "Need[s] Attention." The list included allegations that Mr. Nelson had sexually harassed employees, created a hostile work environment, attempted to influence a school board member, and lied. No details were listed. There is no evidence that this list or the allegations it contained were shared with Mr. Nelson.

On April 2, 2012, Mr. Rust informed Mr. Nelson that "something" had turned up in the investigation. Mr. Nelson asked what had turned up but Mr. Rust would not tell him. Mr. Rust told Mr. Nelson that the Selectboard would be holding a meeting to discuss Mr. Nelson's job. He requested that Mr. Nelson turn over his keys and laptop and go home, and Mr. Nelson complied.

3

On April 3, 2012, Selectman Rust called Mr. Nelson and informed him that the Selectboard was going to meet later that evening to discuss Mr. Nelson's performance, and that his presence was not required. Mr. Nelson attended the meeting. By that date he had retained counsel to advise him about his employment, but he did not bring his attorney to the meeting.

The Selectboard convened the meeting and went immediately into executive session in Mr. Nelson's office. After about 45 minutes, the Selectboard requested that Mr. Nelson join the meeting. The Selectboard claims that it had not yet decided to terminate Mr. Nelson at that time.

According to Mr. Nelson, Mr. Rust said, "We would like to understand the status of the lease with NCIC." Mr. Nelson told the Selectboard that he was having discussions with NCIC, that the terms of the lease were pretty close to worked out, that they had submitted some contract language for review, but that they were not willing to sign the lease until they knew that the Town had funding for the renovations to the Pomerleau Building. The Selectboard asked Mr. Nelson general questions about the NCIC lease and costs of the building. Mr. Nelson told the Selectboard that he had skimmed the proposed lease but had not thoroughly reviewed it. Mr. Nelson printed out the proposed lease and the Selectmen passed it around the room as they were talking. According to Defendants, this was the first time any Selectboard member had seen the proposed lease.  Mr. Nelson states that the lease language was still fluid and that he did not think it was his obligation to turn over every "nit and gnat" during the negotiations.

Defendants allege that they also asked Mr. Nelson about other issues concerning his performance in addition to the Pomerleau Building project and the proposed lease, including: a letter sent by Mr. Nelson to the ex-spouse of a Town employee that included confidential information; his alleged attempt to improperly influence a School Board member on behalf of a non-resident friend who was seeking admission to St. Johnsbury Academy; his lack of truthfulness and candor with Selectboard members; and his treatment of Town employees. Mr. Nelson denies that the Selectboard questioned him about any issue other than the Pomerleau Building project and the proposed lease.

Mr. Nelson recalls that after he had answered the Selectboard's questions, Mr. Rust looked at the other Selectboard members and asked "Has anyone changed their minds?" The Selectboard asked Mr. Nelson whether he wanted to resign. He declined. The Selectboard then returned to public session and took a vote of "no confidence" in Mr. Nelson. Four of the five members voted in favor, with Mr. Rust abstaining. According to Mr. Nelson, he did not understand until then that the Selectboard was terminating his employment.

The minutes indicate that the executive session portion of the meeting lasted from 6:00 p.m. until 8:24 p.m., and the meeting concluded at 8:25 p.m. There is no other record of the meeting.

The following day, the Town issued a press release stating:

> Under Vermont law, the Town Manager is subject to the direction and supervision of the Board of Selectmen. The Manager holds office at the will of the Board. The Town terminated Mr. Nelson for certain actions performed by Mr. Nelson that were directly against the will of the Board and were misrepresented by Mr. Nelson to the Board.

4

After Mr. Nelson's termination, Mr. Rust calculated that the proposed NCIC lease would have resulted in a loss to the Town of $282,107.60 over a ten-year period. The Town subsequently negotiated a more favorable lease with NCIC.

Mr. Nelson filed suit against the Selectboard and its individual members on April 12, 2012, seeking to enjoin them from terminating his employment. He also brought claims for violation of due process, wrongful termination, and promissory estoppel. He later amended his complaint to add claims of conversion, invasion of privacy, breach of contract, failure to timely pay wages, and punitive damages, most of which relate to the Town's alleged interference with his laptop computer. On June 21, 2012, the Court denied Mr. Nelson's motion for a preliminary injunction.

**Conclusions of Law**

### 1.  Defendant Selectboard's Motion for Judgment on the Pleadings

The Defendant "Selectboard" has moved for judgment on the pleadings pursuant to V.R.C.P. 12(c), arguing that all claims against the "Town of St. Johnsbury Selectboard" must be dismissed because the "Selectboard" is not an entity with the capacity to be sued independently of the municipality that it governs. In response, Mr. Nelson moved to amend his complaint to substitute the "Town" for the "Selectboard."  The Motion for judgment in favor of the "Selectboard" as a Defendant is *granted.*  The remainder of Defendants' Motion for Judgment on the Pleadings is addressed below.

### 2.  Plaintiff's Motion to Amend the Complaint

Vermont Rule of Civil Procedure 15(a) provides that a party may amend its pleadings by leave of court, and "leave shall be freely given when justice so requires."  The Court generally grants permission to amend where there is no prejudice to the opposing party and when the amendment is not obviously frivolous or made for the purposes of delaying the case. See *Hunters, Anglers and Trappers Ass'n of Vt., Inc. v. Winooski Valley Park Dist.*, 2006 VT 82, ¶ 17, 181 Vt. 12. None of these circumstances is present here, and the motion is unopposed.  The purpose of the motion is to make the Town of St. Johnsbury, and not the Selectboard, a Defendant. The Motion to amend is *granted* and the Second Amended Complaint is deemed filed.  In this Decision, the analysis addresses legal arguments as they relate to the Defendant Town of St. Johnsbury, and not the "Selectboard."

### 3.  Defendants' Motion for Judgment on the Pleadings:  Defense of Absolute Immunity on the part of Individual Selectboard Members

Defendants argue that the individual Selectboard members are absolutely immune from liability for their official actions. Mr. Nelson has clarified that his only claim against the individual Selectboard members is the § 1983 federal due process claim in which he claims redress for violation of constitutional rights. See Pl.'s Opp. to Defs.' Mot. for J. on the Pleadings at 2 (Dec. 28, 2012) (MPR #14).  He argues that immunity does not apply to such a claim.

In Vermont, two types of immunity protect government officials from personal liability for their official acts and omissions: absolute immunity and qualified immunity. *Czechorowski v. State*, 2005 VT 40, ¶ 10, 178 Vt. 524 (mem.). Absolute immunity protects judges and the state's

highest executive officers for actions taken in their judicial or prosecutorial capacities. *Id.* Absolute immunity has been extended to members of quasi-judicial adjudicatory bodies when their duties are functionally equivalent to those of a judge or prosecutor. See *Butz v. Economou*, 438 U.S. 478, 512–13 (1978) (extending immunity to federal administrative hearing officers). Legislators, including local legislators, are also protected by absolute immunity for actions taken in their legislative capacity. *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998).

"Absolute immunity flows not from rank or title or location within the Government, but from the nature of the responsibilities of the individual official." *Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985) (quotation omitted). Courts take a functional approach to deciding immunity questions, examining "the nature of the functions with which a particular official or class of officials has been lawfully entrusted" and "the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester v. White*, 484 U.S. 219, 224 (1988). Thus, in deciding whether immunity protects a particular official, the Court must first determine in what capacity he was acting when he committed the allegedly unconstitutional act. *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 104–05 (2d Cir. 2001).

Defendants argue that the Selectboard members are entitled to absolute immunity because they were acting in a quasi-judicial capacity when they voted to remove Mr. Nelson as town manager. The selectboard of a town does act in a quasi-judicial capacity in some situations, such as when it conducts proceedings to change the legal status of a town highway or when it decided under prior law whether to grant a zoning permit. See *Ketchum v. Town of Dorset*, 2011 VT 49, ¶ 16, 190 Vt. 507 (mem.); *Petition of St. George*, 125 Vt. 408, 412 (1966). However, the fact that a selectboard has some quasi-judicial powers does not mean that its members are entitled to absolute immunity for every decision they make.

For quasi-judicial absolute immunity to apply, the proceeding at issue must have the "characteristics of the judicial process" and the official must have been acting in a manner akin to a judge or prosecutor. *Butz*, 438 U.S. at 513. The Supreme Court has held that the following factors are relevant in determining absolute immunity:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger*, 474 U.S. at 202.

The statute providing for employment of a town manager, discussed below, does not provide for a quasi-judicial hearing such as those provided for in the statutes related to the cases cited above. The process of hiring and firing an employee is one that typically involves only the employer and employee; it is not an adversary proceeding in which the Selectboard as neutral arbiter decides disputed issues between parties with competing interests. It is not akin to processes for which judges, prosecutors, or hearing officers are responsible, and there is no provision for appeal. The Court cannot conclude that the Selectboard was acting in a quasi-judicial capacity when it terminated Mr. Nelson. The statutory procedure for removing a town

6

manager is not similar enough to a judicial proceeding for absolute immunity to apply. *See Cleavinger*, 474 U.S. at 206.

Defendants argue in the alternative that they were entitled to absolute immunity as legislators. It is true that the selectboard is a legislative body at times, and that local legislators are absolutely immune from § 1983 liability for their legislative activities. *Bogan*, 523 U.S. at 49. Again, however, the Court must examine the nature of a particular function to determine whether it can be characterized as "legislative." *Id.* at 54. Legislation normally is general in its scope rather than targeted on a particular individual. *Indiana Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004). Courts have held that legislators who made a budgetary decision to eliminate a position altogether were acting in their legislative capacity—even though that action affected only one person—and were therefore immune from liability. See, e.g., *Bogan*, 523 U.S. at 54; *Pierce v. Commonfields of Cahokia Pub. Water Dist.*, 2012 WL 4322733 (S.D. Ill. 2012).

However, where legislators decide to fire a particular employee, they are not entitled to absolute immunity because they are considered to be acting in an administrative rather than a legislative capacity. See *Baird v. Bd. of Educ.*, 389 F.3d 685, 696 (7th Cir. 2004) (individual members of school board not entitled to absolute immunity from liability for termination of employee; termination was not legislative act); *In re Montgomery Cnty.*, 215 F.3d 367, 376 (3d Cir. 2000) (county commissioners not entitled to absolute immunity; decision to terminate county housing director was not substantively legislative as it did not involve a matter of general policy applicable to a variety of circumstances or employees). Here, the Selectboard's action was not generally applicable to a variety of employees. It was an administrative decision to remove a particular employee. The fact that the action took the form of a vote does not make it legislative. See *Roberson v. Mullins*, 29 F.3d 132, 134 n.3 (4th Cir. 1994) (holding that a vote is not necessarily a legislative act).

For the above reasons, the individual members of the Selectboard are not entitled to absolute immunity. Defendants' motion for judgment on the pleadings as to individual members of the Selectboard is therefore *denied*.

### 4. Defendants' Motion for Partial Summary Judgment: Defense of Qualified Immunity of Individual Selectboard Members

The individuals named as Defendants, who were Selectboard members at the time of termination, argue that they are entitled to qualified immunity. Qualified immunity protects public officials from liability for their actions where they are "(1) acting during the course of their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts." *Murray v. White*, 155 Vt. 621, 626–27 (1991) (mem.). Mr. Nelson does not contest that the Selectboard members performed a discretionary act that was within the course of their employment and within the scope of their authority when they terminated him. At issue is whether the Selectboard members acted in good faith, i.e., whether they violated a right that was clearly established at the time they acted. *Sprague v. Nally*, 2005 VT 85, ¶ 5, 178 Vt. 22. If they violated a clearly established right, then they were not acting in good faith and could be subject to § 1983 liability.

For a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "There is no need for a case on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Coollick v. Hughes*, 699 F.3d 211, 220 (2d Cir. 2012) (quotation omitted). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *Id.* "Thus, if the official reasonably believes that his or her actions were lawful, the official receives immunity even if a court later determines that they were not." *Sprague*, 2005 VT 85, ¶ 5.

Here, the Selectboard members are alleged to have deprived Mr. Nelson of his property interest in his employment as town manager by terminating him without due process. The question is whether it was clearly established at the time of termination that Plaintiff held a property interest in his employment. If it was clearly established at the time of termination that he was a public employee with a property interest in his employment, he had a clearly established right to pre-termination notice and a hearing. See *Herrera v. Union No. 39 Sch. Dist.*, 2006 VT 83, ¶ 25, 181 Vt. 198 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985)).

Section 1233 of Title 24 governs the employment of town managers, and is the only statute that defines a town manager's interest in his employment. It states that "[i]n all matters [the town manager] shall be subject to the direction and supervision and shall hold office at the will of such selectmen, who, by majority vote, may remove him at any time for cause." Defendants claim that based on this language, the town manager is an "at will" employee under common law, who may be fired without cause at any time, and who therefore holds no property interest in his employment.

Defendants argue that this interpretation is supported by the fact that § 1233 places no limits on the duration of a town manager's employment. Ordinarily, an employee hired for an indefinite period is presumed to be an at-will employee. *Dulude v. Fletcher Allen Health Care, Inc.*, 174 Vt. 74, 80 (2002). At-will employees "may be discharged at any time with or without cause, unless there is a clear and compelling public policy against the reason advanced for the discharge." *Adams v. Green Mountain R. Co.*, 2004 VT 75, ¶ 5, 177 Vt. 521 (mem.). The presumption of at-will status may be overcome by evidence that the employer modified the employment relationship through an express or implied contract that makes the employee terminable only for cause. *Dulude*, 174 Vt. at 80. The facts show no written contract and no specific employment terms or personnel policy applicable to Mr. Nelson.

In opposing the Motion for Partial Summary Judgment, Plaintiff relies on the latter portion of the statute, which states that the selectboard may remove the town manager "for cause." He argues that under the statute, he can only be removed for cause, and therefore he has a right to continued employment and a property interest in employment.

There is tension and a superficial inconsistency between the two clauses of the statute: the first portion seems to provide for "at-will" employment, whereas the second seems to suggest that the basis for termination is "just cause." Section 1233 has not been cited in any reported cases. At the time of termination there was no existing precedent that placed the meaning of the statute "beyond debate." *Coollick*, 699 F.3d at 220. New Hampshire has a nearly identical statute

8

but no relevant case law. N.H. Rev. Stat. Ann. § 37:3. In light of the statutory language, there was a good faith basis for the Selectboard members to construe Mr. Nelson's employment as at-will.  Therefore, the individual Selectboard members are protected by qualified immunity from Mr. Nelson's federal due process claim and are entitled to summary judgment in their favor.

Defendants' Motion for Summary Judgment is *granted* as to all the individually named members of the Selectboard.

### 5. Defendant's Motion for Partial Summary Judgment on Count III (Vermont Constitution, Article IV)

Mr. Nelson claims that his due process rights under Article 4 of the Vermont Constitution were violated by the Town when he was terminated. Article 4 mandates that "[e]very person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which one may receive in person, property or character . . . ." Vt. Const. ch. I, art. 4. Article 4 is the Vermont equivalent of the federal constitution's Due Process Clause. *Quesnel v. Town of Middlebury*, 167 Vt. 252, 258 (1997). There is no established private right of action to enforce Article 4. See *Billado v. Parry*, 937 F. Supp. 337, 345 (D. Vt. 1996) (citing *Rowe v. Brown*, 157 Vt. 373 (1991)).  Mr. Nelson's claim against the Town fails for this reason. Defendants' Motion for summary judgment is *granted* as to Count III.

### 6. Defendant's  Motion for Partial Summary Judgment on Count IV  (Wrongful Termination)

The Town is the only Defendant on Plaintiff's claim for wrongful termination. The Town argues that Mr. Nelson was an at-will employee, that he waived any argument that he was terminable only for cause by failing to make that argument before the Selectboard, and that ample cause existed to justify Mr. Nelson's termination.

This motion calls for the Court to construe 24 V.S.A. § 1233 to determine whether Plaintiff was an at-will employee who could be terminated at any time without any procedural protection, or whether he had a property interest in his employment that entitled him to due process prior to termination.

Title 24 as a whole concerns Municipal and County Government, and § 1233 is within Chapter 37 which is entitled "Town, City or Village Managers."  The two sections pertinent to a town manager's employment status are §§ 1232 and 1233, which provide in pertinent part as follows:

**§ 1232:  Appointment; . . .**

The selectmen of towns adopting the provisions of this chapter shall forthwith appoint a general town manager, who may or may not be a resident of the town for which he is appointed.  . . .

**§ 1233:  Qualifications; authority of selectmen**

Such a manager shall be selected with special reference to his education, training and experience to perform the duties of such office and without reference to his

political belief. *In all matters he shall be subject to the direction and supervision and shall hold office at the will of such selectmen, who, by majority vote, may remove him at any time for cause.* (Italics added.)

It is the interpretation of the last sentence (italicized) that is required to determine Plaintiff's legal interest in his employment as St. Johnsbury Town Manager.

As noted above, the two parts of the sentence appear, at least superficially, to be in conflict, in that the first part uses language of "at the will of such selectmen," suggesting a reference to the legal status of at-will employment, whereas the second part makes specific reference to removal "for cause," suggesting that a town manager may have more rights in the employment status than an at-will employee because otherwise there would be no need for the latter part of the sentence.

It is the Court's obligation to interpret the provision in a manner that reconciles all parts of it and gives effect to all parts to the extent possible.

> The fundamental rule for the construction of statutes is to ascertain the intent of the Legislature. This intent must be ascertained from the act itself, if the language is plain. But when the language used is doubtful in meaning, the true meaning may be ascertained by considering it in the light of all its provisions, the object to be accomplished by its passage, its title, preexisting legislation on the same subject and other relevant circumstances. A statute is to be so construed as to carry out the intent of the Legislature, though such construction may seem contrary to the letter of the statute. When the provisions of a law are inconsistent, effect must be given to those which harmonize with the context and the apparent intent of the Legislature.

*State v. Estate of Taranovich*, 116 Vt. 1, 5 (1949) (citation omittied).

Focusing first on the first part of the last sentence in 24 V.S.A. § 1233, it is useful to note that it does not mandate that *all* municipal managers must be at-will employees. On the contrary, the second half of the sentence suggests the possibility of employment other than at-will. It is reasonable to conclude that persons who have the qualifications described by statute as being desirable for the position may want to have some measure of job security and therefore the ability to negotiate specific contract terms such as duration.[1] If an employee is an at-will employee, he or she can be terminated for any reason at any time, whether there is just cause or not. Since the statute clearly provides for just-cause termination, it cannot be that the Legislature intended *all* town managers to be only at-will employees. The statutory language ("at the will of the selectmen") is broad enough to encompass the authority of the selectboard to negotiate specific contract terms of employment. On the other hand, the provision does not preclude at-will employment. Indeed, the presumptive status of any employee in Vermont is as an at-will employee unless that is modified by an express or implied contract, *Dulude, infra,* at 80, and the statutory language is consistent with this presumption.

---

[1] In *Handverger v. City of Winooski,* 2013 WL 1386070 (D. Vt.), the City Manager had a three year contract. While he was appointed under a City Charter rather than Title 24, the fact of a term for a specific duration is indicative of the kind of employment terms that might be expected for persons in such positions, for whom acceptance of a job may require moving one's home and family.

Turning to the second part (relied on by Plaintiff as the basis for modification from at-will employment), the statute does not provide that a town manager can be terminated *only* for just cause. It specifies that a selectboard must always be able to terminate a town manager where there is just cause, but it does not include any specific rights or protections for a town manager as employee. The provision is not inconsistent with at-will employment in that an at-will employee can be terminated for just cause as well as for other non-cause reasons.

The two parts of the provision may be reconciled without difficulty in that they enable a selectboard to hire a person as town manager on either an at-will basis or on modified terms that provide for a specific duration of employment, *but* if the latter option is chosen, any contract must, by statute, provide for termination for just cause. In other words, a selectboard may contract with a person for a defined term of employment, but does not have the authority to so contract without providing for termination at any time for just cause. The statute instructs the selectboard not to make a contract without providing for just cause termination at any time by majority vote, and any contract entered into by the selectboard is subject, by law, to the ability of the selectboard to terminate for just cause at any time by majority vote.

This makes sense, because if a town manager with a three year contract is found after two years to have embezzled or engaged in other wrongdoing, such a wrongdoer should not benefit financially at the expense of taxpayers: he or she should not be able to claim entitlement to payment for the third year of the contract out of public funds. Nonetheless, this part of the statute does not guarantee to anyone who becomes a town manager that he or she is entitled to continued employment. It only mandates that there can be no express or implied contract that does not include the public's right to terminate for just cause.

In applying this statute to the Plaintiff in this case, there is no evidence that there were any express or implied contract terms of employment. Plaintiff's employment was open-ended, with no fixed duration and no other specific terms, and thus was at-will. As such, he held no property interest in his employment and was not entitled to due process prior to termination: he could be terminated at any time, whether or not there was just cause and whether or not he was afforded due process procedural protections. Accordingly, the Town is entitled to summary judgment on Plaintiff's claim for wrongful termination.

7. **Defendant's Motion for Partial Summary Judgment on Count V: Promissory Estoppel**

The Town also moves for summary judgment on Mr. Nelson's promissory estoppel claim. Vermont recognizes the doctrine of promissory estoppel: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." See *Foote v. Simmonds Precision Prods. Co., Inc*., 158 Vt. 566, 573 (1992). This is the standard set forth in Restatement (Second) of Contracts § 90(1) (1988). "Promissory estoppel may modify an at-will employment relationship and provide a remedy for wrongful discharge . . . if the elements are present." *Foote* at 571.

Mr. Nelson alleges that Attorney Zuccaro, as town agent, told him that he could only be fired for misconduct of the most serious nature. Mr. Nelson alleges that he accepted the position of town manager and purchased a home in St. Johnsbury in reliance on Mr. Zuccaro's

assurances. Defendants contend that Mr. Zuccaro was not authorized to make promises, that the alleged promise was merely a vague oral assurance, and that Mr. Nelson was not justified in relying on Mr. Zuccaro's statements.

The doctrine of equitable estoppel is based upon concerns of public policy and an interest in encouraging fair dealing, good faith and justice. . ."[I]ts purpose is to forbid one to speak against his own act, representations or commitments to the injury of one to whom they were directed and who reasonably relied thereon." *Greenmoss Builders, Inc. v. King*, 155 Vt. 1, 6-7 (1990) (citations omitted). Equitable estoppel has four elements, which the party invoking the doctrine has the burden of establishing: 1) the party to be estopped knows the true facts, 2) the party being estopped intends that his conduct shall be acted upon or the acts must be such that the party asserting the estoppel has a right to believe it is so intended, 3) the other party is ignorant of the true facts, and 4) the party asserting estoppel must rely on the conduct of the party being estopped to her detriment. *Id*.

Plaintiff's facts are not sufficient to support a claim of promissory estoppel because they do not establish either of the first two elements. As to the first element, whether or not the Town knew the true facts, Plaintiff's facts show that Mr. Zuccaro as town attorney had an opinion about the meaning of 24 V.S.A. § 1233, specifically that a town manager could not be fired except for just cause, and further that only serious misconduct could satisfy the 'just cause' standard. There are no facts to show that the members of the Selectboard who hired Mr. Nelson in September of 2010 held the same opinion about the meaning of the statute, nor does Mr. Zuccaro's statement purport to be a statement made on behalf of the Selectboard. The most he offered to do was write a letter that Mr. Nelson could show to the Selectboard stating Mr. Zuccaro's own opinion of the meaning of the statute. The most generous interpretation of this is that Mr. Nelson and the Selectboard could then have had a discussion.

The Town's facts include a sworn statement that Mr. Zuccaro had no legal authority to hire town employees or alter terms of employment or make personnel-related decisions on behalf of the Selectboard, but even looking at Plaintiff's facts in their most favorable light, Mr. Zuccaro did not purport to speak on behalf of the members of the Selectboard so his statements cannot be considered a statement by the Town; he only offered his opinion and a letter that would put Mr. Nelson in the position of engaging the Selectboard on the issue. Plaintiff's facts do not establish that 'the Town knew the true facts;' the 'true facts' as to what the Selectboard thought the statute meant are actually unknown. Thus, Plaintiff does not have sufficient facts to establish the first element.

Plaintiff also does not have sufficient facts to establish the second element, as his facts are insufficient to show reliance at all, and accordingly cannot show justifiable reliance. Plaintiff's facts do not show that he relied on Mr. Zuccaro's statements. First, he is not clear about whether the first conversation with Mr. Zuccaro occurred before or after he had already accepted the non-interim employment on September 27, 2010. Furthermore, Mr. Zuccaro offered to write him a letter that he could show to the Selectboard to address the issue of job protection, but the facts show that Plaintiff never asked for such a letter. This indicates the opposite of reliance—it indicates that he did not place importance on the communication, as he apparently decided to proceed to accept and continue employment without any discussion with the Selectboard. He did not negotiate employment terms with the Selectboard, and had made an offer to buy a house in the St. Johnsbury area 10 months after the first conversation without ever seeking clarification

about whether he had a right to continuing employment, even though the opportunity was offered to him by Mr. Zuccaro. The offer by Mr. Zuccaro was to put him in a position to have a discussion with the Selectboard on the subject; it was not an assurance that the Selectboard itself held the same view that he did. In both the first and second conversations, Mr. Zuccaro's comments were made in response to chance inquiries by Mr. Nelson. They were not made in the course of discussions about employment terms in which Mr. Zuccaro had either actual or apparent authority to make an employment agreement with Mr. Nelson on behalf of the Town.

Plaintiff's facts are not sufficient to establish that Plaintiff either relied on the comments of Mr. Zuccaro, or was justified in doing so. See *Leblanc v. United Parcel Serv., Inc.*, No. 2:95-CV-68, 1996 WL 192011, at *3 (D. Vt. Apr. 2, 1996) ("Vague assurances of continued employment do not constitute negotiated contract terms nor do they alter plaintiff's status as an at will employee."); *Chandler v. Bombardier Capital, Inc.*, No. 90-64, 1992 WL 474798, at *5 (D. Vt. Oct. 8, 1992) (management's statement to employee that "short of [doing something like stealing from the company] you should feel comfortable that a person, you know, of your background could be assured of long term employment until retirement" did not create an implied contract).

In discussing why oral assurances such as these are not interpreted as contractual obligations, Judge Sessions noted that first, "there is an awareness that as two parties embark on a new employment relationship, neither expects it to be unsatisfactory. Reality dictates that such expressions of hope are simply that, and without more, they cannot be held to bind the employer." *Id.* (citation omitted)  He also noted that assurances of employment as long as work is satisfactory cannot be the basis for a contractual obligation because "the concept of satisfaction is an elusive one, which must be left to the discretion of the employer." *Id.* (citation omitted).[2]

In terms of the rationale for the doctrine of promissory estoppel cited above, this is not a situation in which the Town is seeking to repudiate a representation reasonably and justifiably relied on by Plaintiff based on the circumstances under which it was made. The circumstances simply do not demonstrate that it was reasonable and justifiable for Mr. Nelson to have relied on Mr. Zuccaro's comment without having had any communication with the Selectboard itself, which is the body with the authority to make employment decisions about the town manager position.

It is the burden of the Plaintiff to establish a sufficient basis to go to trial on each element. Since Plaintiff's facts are insufficient to establish at least two of the four elements of promissory estoppel, the Town is entitled to summary judgment on the claim.

---

[2] These comments assume statements made by an employer. In this case, Plaintiff's facts involve statements made not directly by the Selectboard or a member, but by a person whose authority to speak for the employer Town on the particular issue was not apparent and in fact contraindicated by Mr. Zuccaro's offer to write a letter that Mr. Nelson could  show to the Selectboard.

**ORDER**

Plaintiff's motion to amend his complaint (MPR #16) is *granted*.

Defendants' motion for judgment on the pleadings (MPR #14) is *denied* (except as to the "Selectboard" as an independent entity).

Defendants' motion for summary judgment (MPR #15) is *granted*.


The case will be scheduled for trial on the remaining claims.


Dated at St. Johnsbury, Vermont this 7th day of August, 2013.

_____
Mary Miles Teachout
Superior Judge

14